

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 0 4 2019

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| CARPENTERS PENSION FUND OF ILLINOIS, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CHERRY BEKAERT LLP, <br><br> Defendant. | Case No. **1 9 - CV - 1 0 2 2** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Lead Plaintiff Carpenters Pension Fund of Illinois ("Plaintiff"),[1] by and through

its undersigned attorneys, makes the following allegations against Defendant Cherry

Bekaert LLP, formerly known as Cherry Bekaert & Holland, L.L.P. ("Cherry Bekaert"

or "Defendant"), based upon personal knowledge, information and belief, and the

investigation of Plaintiff's Counsel, which included a review of documents filed by

---

[1] Carpenters Pension Fund of Illinois is Court-appointed Lead Plaintiff in *In re MiMedx Group, Inc. Sec. Litig.*, No. 1:18-cv-00830-WMR (N.D. Ga.) ("Master Action"), a related case, asserting the same claims based on the same nucleus of operative facts against MiMedx Group, Inc. ("MiMedx" or "Company"), Parker H. Petit ("Petit"), and Michael J. Senken ("Senken"). Pursuant to the Consolidation Order entered on January 16, 2019, this action is consolidated into the Master Action without further order. In accordance with the Scheduling Order entered on February 11, 2019, a Consolidated Complaint is due to be filed on May 1, 2019.

MiMedx with the United States Securities and Exchange Commission ("SEC"), conference call transcripts, news reports, press releases issued by MiMedx, and other publicly available documents. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.    This is a federal securities class action brought on behalf of all persons or entities who purchased MiMedx securities ("Class") between March 4, 2014 and June 29, 2018, inclusive ("Class Period"). MiMedx is a biomedical company based in Marietta, Georgia that calls itself the "leading global supplier of amniotic tissue products." MiMedx designs, manufactures, and sells products derived from human placental tissues intended to enhance healing, modulate inflammation, or minimize scar tissue formation in medical patients. During the Class Period, MiMedx sold its products both directly and indirectly to end customers, with its own sales force and a network of supposedly independent sales agents and distributors.

2.    MiMedx reported explosive growth from 2012 to 2017. From the first quarter of 2012 ("1Q12") through the third quarter of 2017 ("3Q17"), the Company met or exceeded revenue guidance in 26 out of 27 quarters. The Company's reported annual revenue in 2016 was over $245 million, an approximate 3,000% increase over

annual revenue in 2011, just five years earlier. This rapid growth led MiMedx to be named the fifth-fastest growing public company in America by *Fortune* magazine in September 2017. Buoyed by this growth, the Company's stock price surged from $7.31 per share at the start of the Class Period to a high of $18.25 per share on January 29, 2018.

3.      Unbeknownst to investors, however, MiMedx's remarkable growth was predicated on a massive accounting fraud perpetrated at the behest of its executive leadership. During the Class Period, MiMedx and its senior executives deceived investors by, among other things, engaging in a host of improper revenue recognition practices in violation of Generally Accepted Accounted Principles ("GAAP"), failing to disclose these practices, and instead reporting nearly six years of materially false and misleading financial results, as well as issuing numerous other misstatements and omissions regarding the Company's purported success. The Company's pervasive and widespread fraud and accounting improprieties ultimately led it to admit that its SEC-filed financial statements for fiscal years 2012- 2016, and the first three quarters of 2017 should "no longer be relied upon" and would need to be restated.

4.      As detailed herein, MiMedx's accounting machinations included a massive channel stuffing scheme orchestrated in large part through arrangements with the Company's key distributors to prematurely recognize revenue. The Company also

- 3 -

engaged in a host of other improprieties including providing bribes and various other kickbacks to doctors and hospitals to increase "sales" of its products, in violation of multiple federal statutes.

5.      Cherry Bekaert, the Company's supposedly independent auditor, allowed the fraudulent scheme to continue for years. As an independent auditor of a publicly traded company, Cherry Bekaert was responsible for complying with the auditing standards established by the Public Company Accounting Oversight Board ("PCAOB"), assuring that the Company's internal controls over financial reporting ("ICFR") were effective, and obtaining reasonable assurance that MiMedx's financial statements were free of material misstatement through inspection, observation, inquiries, and confirmations.

6.      Cherry Bekaert purportedly obtained sufficient competent evidence for its audits of MiMedx's financial statements and issued unqualified or "clean" audit opinions, certifying that they complied with GAAP and that the Company's ICFR were effective. Cherry Bekaert's supposed independent audits of MiMedx and its "clean" audit opinions provided the Company's financial statements with a false appearance of legitimacy and misled investors. In reality, Cherry Bekaert participated in or simply ignored MiMedx's accounting improprieties and failed to perform key

- 4 -

procedures required under PCAOB standards, rendering its audits so deficient that they were tantamount to no audit at all.

7.      News of the fraud at MiMedx began to slowly leak out publicly, however, through various sources including whistleblower complaints filed by former Company employees.  Following a white-washed internal investigation at the Company into such allegations and mounting scrutiny from the SEC and other governmental authorities regarding its financial relationships with distributors, the Company fired Cherry Bekaert on August 4, 2017, replacing it with Ernst & Young LLP ("EY" or "Ernst & Young").  Over the next few months, additional details concerning the Company's serious and pervasive fraud continued to be exposed, as the Company's improper relationships with its distributors, channel stuffing practices, and improprieties were further revealed.  Desperate to keep its house of cards from collapsing, the Company and Petit, MiMedx's Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors, responded with a vociferous campaign of rebuttals and retaliation.

8.      Mounting pressure from these sources ultimately led the Company to undertake a second internal investigation and postpone the release of its financial results for fiscal year 2017.  Despite misleading assurances from the Company's executives that the Company was enjoying strong sales and financial results,

MiMedx's problems continued to mount. The Company formed a Special Litigation Committee on June 6, 2018. And, just one day later, the Company announced that its second internal investigation had revealed that its reported financial results for fiscal years 2012-2016 and the first three quarters of 2017 were no longer reliable and would have to be restated. The Company also announced that its Chief Financial Officer ("CFO"), Senken, and Controller and Treasurer, John E. Cranston ("Cranston"), had left the Company.

9.     The shakeup continued on July 2, 2018, when the Company announced that based on the Board of Directors' business judgment and information identified through the Company's independent investigation, Petit and the Company's Chief Operating Officer ("COO"), William C. Taylor ("Taylor"), had resigned.   On September 20, 2018, the Company stated that these resignations, as well as Senken's and Cranston's should be treated as terminations for cause because these executives "engaged in, among other things, conduct detrimental to the business or reputation of the company."

10.     The unravelling of MiMedx's fraud eviscerated the Company's stock price, causing it to fall from a Class Period high of $18.25 per share on January 29, 2018 to $3.93 per share on July 2, 2018, resulting in millions in investor losses.

MiMedx continues to be the subject of ongoing investigations by at least the SEC and the United States Department of Justice ("DOJ").

11.     On November 7, 2018, the Company revealed additional facts regarding the magnitude of its revenue recognition problems.  The Company stated that it had to review "all of the Company's" sales dating back to 2012, which would prolong the amount of time it would take for the Company to prepare its restated financial statements, and also revealed that it had received a notice of delisting from the NASDAQ Global Select Market ("NASDAQ").

12.     On December 5, 2018, MiMedx announced a business realignment, workforce reduction, and that its new independent auditor, EY, had resigned its engagement.  In a filing with the SEC two days later, the Company disclosed that EY had advised that "internal controls necessary for the Company to develop reliable financial statements do not exist."  The Company further disclosed that EY had advised that the Company needed "to significantly expand the scope of its audit, due to material allegations of inappropriate financial reporting, material allegations of noncompliance with laws and regulations, the findings to date from the independent investigation conducted by the Audit Committee into these allegations, and the lack of internal controls necessary for the Company to develop reliable financial statements."  The Company has yet to publicly announce a replacement for EY.

- 7 -

13.    The duration and scope of MiMedx's fraud, causing nearly six years of MiMedx's financial statements to be restated, coupled with the non-existence of internal controls at the Company, evidence that Cherry Bekaert utterly disregarded professional standards in conducting its audits of MiMedx's financial statements for fiscal years 2012-2016 and issuing unqualified audit opinions. Had Cherry Bekaert followed PCAOB standards and performed appropriate revenue recognition procedures, it would have uncovered and should have reported the fraudulent accounting violations at the Company.

14.    Defendant's conduct and false and misleading audit opinions during the Class Period enabled and caused the perpetration of the massive securities fraud alleged herein, causing investor losses, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

## II.    JURISDICTION AND VENUE

15.    The federal securities claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

17.     This Court has jurisdiction because Cherry Bekaert is an entity that has sufficient minimum contacts within this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1931(b), as Cherry Bekaert has an office located in this District and conducts substantial business here.  Additionally, many of the acts and practices complained of herein occurred in substantial part in this District, and witnesses and other non-parties, including MiMedx, are located here.

19.     In connection with the acts, omissions, conduct, and other wrongs in this Complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES

20.     Plaintiff Carpenters Pension Fund of Illinois purchased or otherwise acquired MiMedx common stock at artificially inflated prices during the Class Period and suffered economic losses when true facts about the Company's operating and financial condition were disclosed and the artificial inflation was removed from the price of MiMedx common stock.

21.    Defendant Cherry Bekaert is a certified public accounting firm headquartered in Richmond, Virginia, with an office in Atlanta, Georgia. Cherry Bekaert served as MiMedx's independent auditor for fiscal years 2008 through 2016. Cherry Bekaert was dismissed by MiMedx effective August 4, 2017.

22.    With knowledge or reckless disregard of MiMedx's true financial condition, Cherry Bekaert provided unqualified audit opinions that the financial statements contained in MiMedx's annual reports on SEC Form 10-K for fiscal years 2012 through 2016 presented fairly, in all material respects, the financial position and results of operation of MiMedx, and that MiMedx maintained, in all material respects, effective internal control over its financial reporting for fiscal years 2012 through 2015 (citing a failure to maintain internal controls in 2016).

## IV.    RELEVANT NON-PARTIES

23.    Non-party MiMedx is a Florida corporation with its principal place of business located in Marietta, Georgia. From April 25, 2013 through November 7, 2018, MiMedx's common stock was publicly traded on the NASDAQ under the ticker symbol "MDXG." Effective November 8, 2018, MiMedx's common stock was delisted from the NASDAQ and began trading on the over the counter market operated by OTC Markets Group Inc. under the same ticker symbol, "MDXG."

- 10 -

24.    Non-party Petit joined MiMedx as CEO, President, and Chairman of the Board of Directors on February 24, 2009. Petit was terminated from those positions for cause, effective June 30, 2018. Thereafter, Petit continued to serve as a member of the Company's Board of Directors until he was forced to resign from that position effective September 20, 2018.

25.    Non-party Senken was CFO of MiMedx from January 15, 2010 through June 6, 2018, and was subsequently terminated from the Company for cause and departed on June 30, 2018, after briefly serving in a transitional role.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    MiMedx, Its Products, and Distributors

26.    MiMedx is a biomedical company based in Marietta, Georgia that began its current business on February 8, 2008. MiMedx calls itself the "leading global supplier of amniotic tissue products." MiMedx designs, manufactures, and sells products derived from human placental tissues. Using a proprietary sterilization process called "PURION," MiMedx takes amniotic membranes from these tissues and processes them into allografts intended to enhance healing, modulate inflammation, or minimize scar tissue formation in medical patients. These products are sold in the form of sheets or wraps applied to a patient's skin (often referred to as "grafts" or

"tissues") or in the form of micronized powders applied to a patient's skin either topically or by injection.

27.     MiMedx reports revenue in two separate product categories: (1) Wound Care and (2) Surgical, Sports Medicine & Orthopedics ("SSO").  Wound Care represents the larger of the two categories, with $184 million reported revenue in fiscal year 2016 (75% of total revenue), compared to $61 million reported revenue from SSO the same year (25% of total revenue).

28.     MiMedx's primary commercial products are EpiFix and AmnioFix. EpiFix is a Wound Care product configured for external use.  It is intended to treat inflammation and chronic wounds, including diabetic foot ulcers, venous leg ulcers, arterial ulcers, burns, and surgical wounds.  The most expensive EpiFix product was the 7x7 cm graft, which cost approximately $6,000 per graft.

29.     AmnioFix is an SSO product configured for internal, surgical use.  It is intended to treat inflammation, minimize scar tissue formation, and treat conditions such as tendonitis, plantar fasciitis, lateral epicondylitis, medical epicondylitis, bursitis, strains, and sprains.  Like EpiFix, AmnioFix is sold both in sheet form (AmnioFix and AmnioFix Wrap) and injectable, micronized powders form (AmnioFix Injectable).

- 12 -

30. MiMedx sells to private healthcare providers (including physicians, hospitals, and ambulatory surgery centers) and also to the U.S. government. During the Class Period, the majority of these government sales were to Veterans Health Administration ("VA") facilities located throughout the country. The VA operates the largest integrated health care system in the United States, comprised of over 1,200 medical facilities including hospitals and outpatient clinics, serving approximately 9 million enrolled veterans of U.S. military service each year.

31. MiMedx sells its products both directly and indirectly to end customers, with a sales force of approximately 320 employees and a network of sales agents and distributors that are purportedly independent from MiMedx. MiMedx states that no agent or distributor comprises more than 5% of its business with the exception of AvKARE, its largest distributor during the Class Period, which began doing business with MiMedx in May 2012. Through AvKARE, MiMedx sold products to the VA and other government medical facilities. Sales that were purportedly made through AvKARE comprised a "significant portion of [MiMedx's] revenues and accounts receivable," according to the Company. Specifically, the Company disclosed that AvKARE accounted for the following portions of the Company's total annual revenues: 40% in 2012; 56% in 2013; 34% in 2014; 24% in 2015; and 25% in 2016 (the last year such percentage was reported).

- 13 -

**B.    MiMedx's Growth and the Illicit Practices Used to Inflate Its Revenue**

32.     From 2012 to 2017, MiMedx experienced remarkable growth and consistency in meeting or beating revenue guidance. As sales to both commercial and federal sources accelerated, the Company's total sales jumped from $7.7 million in 2011 to over $20 million in 2012. For nearly six years thereafter, from 1Q12 to 3Q17, MiMedx boosted its market value to nearly $2 billion, and met or exceeded revenue guidance in 26 out of 27 quarters. The Company's reported annual revenue in 2016 was over $245 million, an approximate 3,000% increase over annual revenue in 2011 just five years earlier.

33.     Unfortunately, MiMedx's growth story was too good to be true. Throughout the Class Period, senior management at MiMedx directed, participated in, and had knowledge of illicit, widespread practices to artificially inflate the Company's financial numbers and falsely portray the Company's purported growth. As further detailed below, the Company used its distributors to engage in a massive channel stuffing scheme and premature revenue recognition. The Company also used bribes and various other kickbacks to doctors and hospitals in order to induce the use of its products and as a means to facilitate its channel stuffing scheme. MiMedx and its management-level employees deceived investors by failing to disclose these practices, and instead reporting nearly six years of materially false and misleading financial

results and making numerous other false and misleading statements regarding the Company's purported success. As a result, the Company's stock price traded at artificially high prices during the Class Period.

### 1. MiMedx Engaged in Improper Revenue Recognition and Channel Stuffing

34. Unbeknownst to investors, MiMedx engaged in a host of accounting machinations during the Class Period. Chief among these was its use of distributor relationships to excessively stuff channels with MiMedx products that were never ordered or requested by customers, particularly at the end of financial quarters, in order to prematurely recognize revenue and falsely portray revenue growth. In other instances, MiMedx stuffed shelves by shipping products directly to customers, without the use of distributors. As a result, MiMedx improperly recognized revenue in violation of accounting standards throughout the Class Period.

### a. The Company Uses Its Distributors to Facilitate its Accounting Practices

35. The Company's distributors were key to its channel stuffing and improper revenue recognition practices. While the Company held its distributors out as independent, they were really pass through entities, controlled by the Company, and used as intermediaries to inflate MiMedx's financial statements. As further detailed below, in order for a sale to be booked to a distributor under appropriate

accounting principles, risk of loss of the product must be transferred to that entity. MiMedx did not adhere to this tenant. Instead, after booking the sale of a product to a distributor, MiMedx maintained control of the product and responsibility re-selling it to end customers.

36.     The Company worked with several Master Distributors, including AvKARE, CPM Medical, Inc. ("CPM"), and SLR Medical Consulting ("SLR"). AvKARE possessed a Federal Supply Schedule ("FSS") contract with the U.S. government, which allowed it to sell products to VA hospitals. MiMedx engaged AvKARE to serve as a conduit to make sales to VA hospitals. As part of their Production Distribution Agreement, AvKARE purchased products from MiMedx, and then sold the same products to the VA pursuant to AvKARE's FSS contract with the U.S. government. In order to make such purchases, the written agreement required AvKARE to submit purchase orders to MiMedx. AvKARE was then required to pay MiMedx within 45 days of receiving the product from MiMedx or invoicing the product to MiMedx, whichever was later.

37.     However, MiMedx exercised control over AvKARE and the distribution and resale of MiMedx products to VA hospitals. At the direction of MiMedx management, MiMedx sales representatives ordered products under AvKARE's account through MiMedx's SalesForce software that was accessible on the

- 16 -

smartphones of MiMedx sales representatives. This happened regardless of whether AvKARE had requested the orders. Such orders would be "billed" to AvKARE's account and MiMedx would send the products directly to VA hospitals prior to the payment of those products, recognizing the revenue for those products at the time of shipment. Following shipment, MiMedx sales representatives were responsible for completing the "resale" of the products to the VA hospitals, including obtaining purchase orders from the VA hospitals.[2]

38.    Moreover, the Company used AvKARE as a pass through to supply VA facilities with excess MiMedx products that was never ordered, in order to give the appearance that the Company was selling more product than it was actually selling.[3] This practice, coupled with the Company's premature revenue recognition allowed the Company to meet or exceed growth projections by artificially inflating quarterly revenue numbers.

39.    This allegation is supported by the deposition testimony of Michael Carlton ("Carlton"), the Company's Vice President of Global Sales, in the case

---

[2]    *MiMedx Group, Inc. v. Fox*, No. 1:16-cv-11715-MSS-SIS (N.D. Ill.) ("*Fox*"), ECF No. 147, at ¶¶26-38; The Capitol Forum, "MiMedx: Channel Stuffing Accusations Resurface in Recent Counterclaim; Former Employees Corroborate Allegations; A Close Look at Potential Risk" (Aug. 21, 2017).

[3]    *Fox*, ECF No. 147, at ¶¶26-30.

captioned *Mid-South Biologics, LLC v. MiMedx Group, Inc.*, No. 2:17-cv-02028-JTF

(W.D. Tenn.). Carlton confirmed that AvKARE was not an independent distributor

with its own sales force, stating in a 2012 deposition that "***AvKARE didn't sell the***

***product. They didn't do anything. They just made it easier to sell***. . . . AvKARE just

made it easier to do business. They didn't have sales guys."[4]

40.    Another high-ranking Company executive, Michael Fox ("Fox"), former

Area Vice President for the Company's Central area, during the course of ongoing

lawsuit with the Company, in which he has alleged facts relating to its improper

AvKARE relationship and channel stuffing, summarized the Company's fraudulent

scheme with AvKARE as follows:

> Whether it was a condition of a formal, written agreement, an oral side
> agreement, or established practice, MiMedx agreed to credit back to
> AvKare the amounts for any lost or damaged products that had been
> placed on VA shelves. And whether a condition of a formal, written
> agreement, an oral side agreement, or established practice, MiMedx
> agreed to owe substantial performance obligations to AvKare to ensure
> the re-sale of AvKare tissue to the end customer. These undisclosed
> agreements were necessary to ensure AvKare's cooperation with the
> fraudulent scheme.[5]

41.    According to Fox and other former MiMedx employees, the Company

also misrepresented its revenue recognition with respect to consignment inventory that

---

[4]    *Id.*, Deposition Transcript of Michael Carlton, ECF No. 43-3, at 47:6-7, 15-16.

[5]    *Fox*, ECF No. 147, at ¶30.

was supposedly distributed through AvKARE.[6] The Company and AvKARE were parties to consignment agreements with certain VA hospitals, whereby products would be shipped to VA shelves before they were actually needed by the VA hospitals. Under these agreements, MiMedx or AvKARE (consignor) continued to own the products until the VA (consignee) in effect purchases them by using them. With respect to consignment sales, MiMedx claimed that it "recognizes revenue when we are notified that product has been used or implanted."[7] This was false because, MiMedx would book revenue at the time the product was supposedly shipped to AvKARE, not when it was used by the VA, and the revenue booked in this manner would be included in the Company's publicly filed financial statements.

42.    These practices violated GAAP revenue recognition principles, which dictate that revenue should not be realized "where title to delivered products passes to a buyer, but the substance of the transaction is that of a consignment or a financing."

---

[6]    *Kruchoski v. MiMedx Group, Inc.*, No. 50 2016 CA 013806 XXXX MB AA (Fla. 15th Jud. Cir.) ("*Kruchoski*"), Defendant, Jess Kruchoski's Third Amended Counterclaim, ECF No. 83517622, at ¶¶21-22; *MiMedx Group, Inc. v. Tornquist*, No. 1:27-cv-00399-LMM (N.D. Ga.) ("*Tornquist*"), Defendant's Second Amended Verified Answer, Affirmative Defenses, and Counterclaims for Declaratory Judgment, Injunctive Relief, Damages, and Attorneys' Fees, ECF No. 146, at ¶¶64-65.

[7]    Letter to the SEC from MiMedx, dated April 18, 2017.

*See* Financial Accounting Standards Board  Accounting Standards Codification Topic 605, *Revenue Recognition* ("ASC 605") at ASC 605-10-S99-1.

43.     These practices were corroborated by another former employee who, despite his concerns, was instructed to add as much MiMedx product as possible to shelves of the VA hospital in Minneapolis.  Luke Tornquist ("Tornquist"), a former Account Executive at the Company has detailed and corroborated facts surrounding MiMedx's channel stuffing scheme in litigation surrounding his employment at MiMedx.   On December 15, 2016, two former employees of MiMedx – Jess Kruchoski ("Kruchoski") and Tornquist – filed a lawsuit in the United States District Court for the District of Minnesota against MiMedx and Petit.[8]  Among other things, that lawsuit put forward detailed allegations about a "channel-stuffing scheme" orchestrated by MiMedx and its executives to "fraudulently recognize revenue in its certified financial statements before the revenue had been realized or realizable and earned."[9]

44.     These allegations are further confirmed by a transcript of a conversation between Steven Blocker ("Blocker"), MiMedx's Area Vice President for the Central

---

[8] *See Kruchoski v. MiMedx Group, Inc.*, No. 16-cv-04171-RHK-BRT (D. Minn. Dec. 15, 2016) ("*Kruchoski/Tornquist*"), First Amended Complaint, ECF No. 4.

[9]    *Id.* at ¶¶17-27.

Area, and Kruchoski, which was set forth in *Fox*. The March 22, 2016 exchange, in

pertinent part, is as follows:

> **Blocker**: But I told Chris Cashman what's going to prevent me from doing [$3.7 million], you know – we were on a call. And I said what's gonna prevent me is par levels at certain hospitals, you know, warnings that come down by saying: Don't send this again, don't send this much again. People that don't have carte blanche at their facilities are starting to get, you know, questions.
>
> **Kruchoski**: Right.
>
> **Blocker**: And I don't want to do anything to jeopardize that. I said: There's still – still some instances where I'm free to do whatever I want. And I go: And certainly we'll look at those avenues moving forward, I says, but I don't have those same luxuries anymore. And [Chris Cashman's] response was: Well, do they have healing reviews down at those accounts?
>
> **Kruchoski**: Come on.
>
> **Blocker**: And I said I – and I said: Chris [Cashman] – I said: In all fairness – I said, you know: A healing review has no bearing on providing any extra shelf space or alleviating the concerns of some, you know, floor manager or department manager who's looking at how many grafts are spilling out of every cabinet available to us. I said: And what it helps with is when chief of surgery or chief of staff comes down and questions the amount of product that's being used, I go: That doesn't help us in any capacity for what's being, you know, stuffed in our VAs. So that –
>
> **Kruchoski**: [Unintelligible.]
>
> **Blocker**: – to me shows that they don't understand. So it's [Chris] Cashman and [Michael] Carlton. And, you know, to a certain degree, you know, Bill [Taylor] has removed himself from it. So has Pete [Petit]. So it's pretty much direction from Cashman and Carlton given to Lou Roselli. . . .

**Kruchoski**: I don't – like, they realize, don't they, I think – they should, that the AvKARE number is not a real number. It's based on – they just don't get it. Like, I know they know this, but it's like what's driving them? Are they just so worried that we're not gonna hit that quarterly number and then what it's gonna do to the stock or – I don't get why it's such a – every single – every single quarter in the last three weeks of the quarter we get into this game. And then the sad part is, this is what I was saying about April, like, we're trying to chase a growing number – but trying to grow on a number that was built on false growth.

**Blocker**: Yeah.

**Kruchoski**: What's the – what are they threatening to you if you don't hit that number? Is it just a respect issue? Is it –

**Blocker**: Nothing really. There's just an insinuation that there will be hell to pay. And, you know, Pete [Petit] says: Well, you don't want to be on the wrong end and not hit your number, you know. And I sit on a call, you know, Jess Kruchoski style. I said: Well, what happens if we don't hit our number, you know? . . .

**Kruchoski**: It's like we're – we're – we're throwing down emails on what happened at ABH about how this is this, you know, [Osiris] is under investigation for this, but by the way, get those shelves stocked at the VA so that we can hit our number. It's just – it's such a hypocrisy that it's hard to – it's hard to get in line and go: Yeah, I'm excited about that. And I – and especially considering we're the ones that have to burn the political capital in front of the customer who goes into that closet every single day hopefully and says: What the hell is [unintelligible]?[10]

45.    Further, by the end of the first quarter of 2016, Cashman and another senior manager at MiMedx hatched a new channel stuffing plan called the Limb Salvage Initiative. They determined that the most efficient method of channel stuffing

---

[10] *Fox*, ECF No. 147, at ¶¶54-55.

involved 7x7 cm EpiFix skin grafts. These grafts occupied little shelf space compared to the high price MiMedx charged for each graft. However, MiMedx's sales were previously limited by the fact that customers had no need to order large volumes of 7x7 cm grafts because they were rarely used in medical procedures due to their relatively large size (roughly the size of an iPhone).[11]

46.    Under the Limb Salvage Initiative, between March 22 and March 31, 2016, the Company sent at least 375 7x7 cm EpiFix grafts to 20 VA facilities across the country. This represented approximately $2 million to $2.4 million of excess grafts, as the VA hospitals had no need for more than 5 such grafts during an entire year. MiMedx billed AvKARE and booked revenue for these grafts at the time of shipment. MiMedx understood that most of these grafts would be slowly returned with coordination from the Company's management, and planned to conceal losses associated with these returns with revenue from future fiscal quarters.[12]

47.    In addition to the Limb Salvage Initiative, MiMedx advanced the channel stuffing scheme by shipping consignment products under the guise of "pre-

---

[11]  *Fox*, ECF No. 147; *Kruchoski*, ECF No. 83517622.

[12]  *Fox*, ECF No. 147; *Kruchoski*, ECF No. 83517622; *Tornquist*, ECF No. 146.

authorization"[13] arrangements with VA hospitals, allowing the Company to ship without prior approval from anyone at the VA. MiMedx engaged in similar practices through the commercial (private, non-government) channel. In some instances this occurred through direct shipments to private doctors, hospitals, and other medical facilities. In other cases, commercial distributors agreed to accept large volumes of MiMedx products at the end of financial quarters in exchange for benefits such as exclusive territory rights, liberal rights of exchange, and highly favorable financing terms with lines of credit with extended payment terms. These arrangements helped MiMedx continually meet quarterly revenue projections throughout the Class Period.

48.    Former MiMedx employees began to object to this fraudulent scheme. For example, Fox worried that the Company's aggressive channel stuffing through AvKARE would compromise MiMedx sales executives' relationships with VA facilities, as some VA representatives were questioning the amount of MiMedx products on their shelves. In particular, Fox repeatedly raised such objections to senior management. Fox told them that revenue reported from AvKARE was a "*false performance number*" that was only used to boost MiMedx's stock price. In multiple

---

[13]    Viceroy Research Group, "MiMedx caught red-handed circumventing VA regulations" (Nov. 3, 2017).

conversations, MiMedx executives acknowledged that the AvKARE revenue was in fact a "***bullshit number***" for Wall Street that did not reflect actual sales.

49.    The Company also engaged in improper channel stuffing and improper revenue recognition practices with its master commercial distributor CPM, a Lewisville, Texas-based company that MiMedx had designated as a nationwide "Master Distributor" of MiMedx products.  MiMedx used CPM as a distributor from 2014 through June 2015.[14]  CPM distributed MiMedx products through sub-distributors, typically physician-owned distributors, in order to inflate revenue and hit quarterly numbers.  MiMedx essentially had control over CPM.  To facilitate the channel stuffing arrangement, MiMedx gave CPM significant product discounts, as well as exclusive territory rights within Texas, in exchange for CPM placing large orders for MiMedx products at the end of quarters to help MiMedx meet its revenue guidance for those quarters.[15]

50.    After CPM allegedly defaulted on its credit line, MiMedx shifted much of its commercial channel stuffing efforts from CPM to SLR, a nationwide distributor based in Dallas, Texas.[16]  Like CPM, MiMedx essentially controlled SLR.  SLR's

---

[14]  *Kruchoski*, ECF No. 83517622, at ¶¶68-69.

[15]  *Id.*, at ¶70.

[16]  Aurelius Value, "MiMedx: Flying Too Close To The Sun" (Sept, 20, 2017).

President and CEO, Jerry Morrison ("Morrison"), also worked at MiMedx from July 2013 to September 2015, as Sales Director, Surgical and Orthopedic. Morrison's employment at MiMedx was terminated in September 2015 for personally selling MiMedx's product Amniofix "on the side" through SLR. After he was terminated, he moved to SLR and continued to work with MiMedx.

51.    MiMedx's commercial channel stuffing practices were corroborated by Village Podiatry Group, LLC ("Village Podiatry"), another former commercial customer of MiMedx from February 2013 to January 2017. According to Village Podiatry, which operated approximately 40 podiatry clinics throughout Georgia, MiMedx engaged in "fraudulent sales tactics – channel stuffing. . . . [MiMedx's] sales staff would purposely overstock the shelves of [Village Podiatry's] locations – without any request from [Village Podiatry] – presumably to show higher sales revenue numbers. [Village Podiatry] believes this sales strategy was designed by [MiMedx] to overstate its sales revenue to meet Wall Street expectations for [MiMedx] – a publicly traded company."[17]

---

[17]    *MiMedx Group, Inc. v. Village Podiatry Group, LLC*, No. 17EV000617 (Fulton Cty. Ct.), Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, at 5-6 (Aug. 14, 2017).

### 2.    MiMedx Further Inflated Revenue Through Improper Kickback and Bribes

52.    During the Class Period, MiMedx also engaged in a multi-faceted scheme involving the payment of kickbacks and bribes to doctors, hospitals, and patients to induce the usage of MiMedx products. These practices improperly enriched MiMedx at the expense of the federal government, including VA facilities and Medicare. As such, these practices violated host of federal statutes, including:

- The Anti-Kickback Statute, 42 U.S.C. §1320-7b, makes it a crime to knowingly and willingly offer, pay, solicit, or receive anything of value (directly or indirectly) in order to induce or reward referrals of items or services reimbursable by a federal health care program;

- The False Claims Act, 31 U.S.C. §§3729 et seq., which protects the federal government from being overcharged or sold substandard goods or services by imposing civil liability on any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the federal government (including federal healthcare programs such as Medicare or Medicaid), which in the healthcare context includes billing for unnecessary services and billing for services or items that were not rendered;

- Bribery of Public Officials Statute, 18 U.S.C. §201, which prohibits directly or indirectly giving, offering, or promising anything of value to a federal government official to influence an official act or fraud on the United States;

- The Health Care Fraud Statute, 18 U.S.C. §1347, which makes it a criminal offense to knowingly and willfully execute a scheme to defraud a healthcare program; and

- The Physician Payments Sunshine Act ("Sunshine Act"), 42 U.S.C. §1320a-7h, which requires medical product manufacturers to disclose to the Centers for Medicare and Medicaid Services ("CMS") any payments or other transfers of value made to physicians or hospitals.

53.     The revenue gained from these illicit practices inflated the Company's financial performance, and helped cushion product returns resulting from the Company's rampant channel stuffing. This insured that MiMedx would continue to meet or beat growth estimates, which in turn kept the Company's stock price artificially inflated throughout the Class Period.

54.     For example, bribes were routinely made to employees of VA facilities. Over the course of at least three years (from 2012 to 2015), the Company bribed three employees a VA facility in Columbia, South Carolina for the purpose of promoting and encouraging the VA to order MiMedx products. MiMedx's improper conduct was explained on May 8, 2018, when the DOJ released a statement that a federal grand jury in Greenville, South Carolina had returned an Indictment against two doctors and a nurse practitioner from a VA facility in Columbia, South Carolina. The DOJ charged them with conspiracy to knowingly commit healthcare fraud involving benefits received from MiMedx. According to the Indictment, the alleged conspiracy involved VA defendants' receipt of meals, salaries, trips, gifts, and other in-kind inducements from MiMedx to induce them to order, purchase, and use MiMedx

products, which caused "the excessive use of MiMedx products on VA patients in South Carolina." The Indictment further alleged that the VA defendants participated in speaking engagements on behalf of MiMedx with the goal of increasing sales to VA facilities, through which the VA defendants "*became employees, agents, or independent contractors of MiMedx*."[18]

55.    According to a February 22, 2018 *The Wall Street Journal* article entitled, "MiMedx, Fast-Growing Developer of Tissue Graft Products, Didn't Report Payments to Doctors," MiMedx also had financial ties to more than 20 doctors as of February 2018, but had not reported such ties to the government as required under the Sunshine Act. Failure to report under the Sunshine Act carries a maximum penalty of $1 million per year. The purpose of this law is to "*stop dishonest influence* on research, education, and clinical decision-making," according to the CMS, which oversees the program. Each year in June, CMS publishes data detailing prior year payments to doctors for consulting, entertainment, research, speaking, and travel costs. The CMS website shows no record of payments by MiMedx to any doctors or hospitals in recent years.

---

[18]    Department of Defense Indictment, *U.S. v. Becker*, No. 6:18-cr-00481-DCC (D.S.C. May 8, 2018), at 2; MiMedx, "MiMedx Comments On Matters Related To Former VA Employees" (May 10, 2018).

## C.    Cherry Bekaert's Critical Role in MiMedx's Channel Stuffing Scheme

56.    Cherry Bekaert was MiMedx's independent auditor from 2008 until their dismissal on August 4, 2017. During the Class Period, Cherry Bekaert repeatedly issued clean audit opinions concerning the accuracy of MiMedx's financial statements despite rampant improper revenue recognition, channel stuffing practices at MiMedx, as well as violations of multiple federal statutes. Similarly, with the exception of the 2016 fiscal year, Cherry Bekaert issued clean audit opinions regarding the effectiveness of MiMedx's ICFR.

57.    In its 2016 Form 10-K, MiMedx admitted that the Company's ICFR was ineffective as of December 31, 2016, due to a material weakness in the design of the Company's controls over the tax accounting related to an overstatement of an excess tax benefit which if undetected would have resulted in an understatement of income taxes payable. Specifically, management did not have adequate supervision and review of certain technical tax accounting performed by a third party tax specialist in 2016. As a result of this material weakness in income tax accounting, Cherry Bekaert issued an adverse audit opinion over MiMedx's ICFR as of December 31, 2016. However, Cherry Bekaert *failed to* report that MiMedx had material weaknesses in ICFR over its accounting for revenue or an ineffective control environment in ICFR.

- 30 -

58.    Auditing (PCAOB) standards were specifically designed to ensure that false financial statements and material weaknesses are brought to the attention of investors.[19] PCAOB standards are also designed to ensure that a registrant's (*i.e.*, MiMedx) external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings. An audit is a specific type of attestation service performed by qualified Certified Public Accountants.[20] The results of an audit are expressed by a Certified Public Accounting Firm in the form of an audit opinion. For example, Cherry Bekaert as part of its audits of MiMedx's financial statements and ICFR, issued audit opinions attesting that

---

[19]    To oversee independent auditors, Sarbanes Oxley established the PCAOB. The PCAOB was given the responsibility  to establish professional audit standards applicable to audits of public companies, and has now adopted, amended, and expanded upon the auditing standards and interpretations previously issued by the American Institute of Certified Public Accountants ("AICPA") (referred to herein as "AU__"), and has also promulgated additional auditing standards (referred to herein as "AS__"). PCAOB standards "provide a measure of audit quality and the objectives to be achieved in an audit." AU §150.01

[20]    "In an attest service, the practitioner expresses a conclusion about the reliability of a written assertion that is the responsibility of another party, the asserter." AICPA *Statement on Standards for Consulting Services No. 1* (1992). To "attest" means "to establish or verify." Thus, through its audit, Cherry Bekaert was verifying that the financial statements were prepared in accordance with GAAP. GAAP is recognized by the SEC and the accounting profession as the uniform set of rules, conventions and procedures necessary to define accepted accounting practice at a particular time.

MiMedx's financial statements complied with GAAP and attesting to the effectiveness of MiMedx's ICFR.

59.     Auditing standards require that an auditor "state whether, in his opinion the financial statements are presented in conformity with generally accepted accounting principles and to identify those circumstances in which such principles have not been consistently observed." AU §110.01.  The standards make clear that, rather than rely on subjective opinion, in performing an audit "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." AU §150.02.  Thus, an audit includes procedures to gather evidence, through which the auditor can certify that the financial statements comply with GAAP, opine that they do not comply, or state that the auditor is unable to form an opinion on compliance.  *Id*.  In conducting the audit, the auditor is required to exercise professional skepticism which requires "[g]athering and objectively evaluating audit evidence." AU §§230.07, 230.08.

60.     In certifying the Company's annual reports, Cherry Bekaert knew or was severely reckless in not knowing that investors would rely on its audit opinions with respect to MiMedx's financial statements and the effectiveness of the Company's

ICFR when deciding whether or not to invest in the Company. This concept of public

trust was reiterated by a former Commissioner of the SEC, in relevant part, as follows:

> Under the federal securities laws, accountants act as gatekeepers to the public securities markets. These laws require, or permit the Commission to require, that independent public accountants certify financial information filed with the Commission. As we all know, without an opinion from an independent auditor, a company cannot satisfy the statutory and regulatory requirements for audited financial statements.[21]

61.    Before the market opened on June 7, 2018, MiMedx issued a Form 8-K

wherein the Company announced that its previously issued consolidated financial

statements and financial information relating to each of the fiscal years ended

December 31, 2012, 2013, 2014, 201,5 and 2016, and each of the interim periods

within such years, along with the unaudited condensed consolidated financial

statements included in the Company's quarterly reports on Form 10-Q for the quarters

ended March 31, 2017, June 30, 2017 and September 30, 2017 (collectively, "Non-

Reliance Periods"), *should be restated* ("Restatement"). Therefore, such consolidated

financial statements and other financial information, any press releases, investor

presentations or other communications related thereto *should no longer be relied*

*upon*.

---

[21]    Speech by SEC Commissioner: Remarks Before the AICPA National Conference on Current SEC and PCAOB Developments by Commissioner Elisse B. Walter (Dec. 9, 2009).

62.    In the June 7, 2018 non-reliance announcement, MiMedx admitted that over five years of financial statements audited and reviewed by Cherry Bekaert would need to be restated based on improper revenue recognition with certain sales and distribution practices at MiMedx.  Specifically, the determination of the need to restate was based on investigation results to date which have primarily been focused on the accounting treatment afforded to such sales and distribution practices for two distributors for which certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods.  Further, the accounting misstatements will also require adjustments to the periods in which such revenues were recognized so that such revenues for product sold are recognized in the period in which such amounts were actually collected.  MiMedx also admitted the announced Restatement would impact a multitude of financial accounts including, gross margin, operating income, income before taxes, income taxes, net income, earnings per share ("EPS"), accounts receivable and related reserves, returns allowances, inventories, and other financial items in particular periods.

63.    The Company's June 7, 2018 Form 8-K also revealed the existence of material weaknesses relating to the announced Restatement.  MiMedx concluded that its ICFR were ineffective in all of the Non-Reliance Periods (*i.e.*, December 31, 2012 through September 30, 2017).  Accordingly, the Company announced that it will

- 34 -

restate its disclosures for the affected periods to include the identification of material weaknesses related to its announced Restatement.

64.    By way of these statements, MiMedx admitted that, ***despite Cherry Bekaert's original certifications and audit opinions***, MiMedx's financial statements for the fiscal years ended December 31, 2012, 2013, 2014, 2015, and 2016 were materially misstated and did not comply with GAAP. Similarly, MiMedx admitted that, ***despite Cherry Bekaert's assertion to the contrary***, its ICFR were not effective as of December 31, 2012, 2013, 2014, 2015 and 2016 due to the announced Restatement.[22]

### 1.    Cherry Bekaert's Failure to Comply with PCAOB Standards over MiMedx's Financial Statements

65.    Cherry Bekaert failed to conduct its audits in accordance with PCAOB standards. The public disclosures made by MiMedx as part of the ongoing internal investigation has made it abundantly clear that Cherry Bekaert put their financial interests ahead of their professional obligations and failed to comply with PCAOB standards.

---

[22] As discussed above, MiMedx's 2016 Form 10-K did disclose its ICFR were ineffective due to a material weakness in income tax accounting. However, the Company did not disclose any material weaknesses in its accounting for revenue or its ineffective control environment. Similarly, Cherry Bekaert only issued its adverse audit opinion on the Company's ICFR due to the material weakness in income tax accounting.

66.     First, MiMedx has admitted that it issued financial statements for over a five year period that will need to be restated due to improper revenue recognition. During this period, Cherry Bekaert repeatedly assured investors they could rely on such financial statements.  The Company's announced Restatement makes clear the Company's growing sales were too good to be true and Cherry Bekaert knew, or was reckless in not knowing, this was the case.  MiMedx was fraudulently recognizing revenue outside of the explicit terms of their contracts and before such revenue was realized or realizable and earned.  These practices constituted basic revenue recognition violations, including that risk of loss and title had not transferred to the distributor(s) and collectability was not probable at the time revenue was improperly recognized. *See* ASC 605-10-S99-1.  As a result, the Company must adjust revenues for product sold so they are recognized in the period in which such amounts were actually collected.

67.     One of the distributors where improper revenue recognition occurred was AvKARE.  Cherry Bekaert knew that AvKARE was one of MiMedx's largest customers as for the years ended December 31, 2015, 2014, 2013, and 2012, AvKARE revenue was approximately 24%, 34%, 56% and 40%, respectively, of MiMedx's total revenue.

68.    Such a significant customer would have required Cherry Bekaert to understand MiMedx's revenue recognition policy with AvKARE and substantively test that the Company's sales with AvKARE were being recorded consistent with the contract terms and appropriately under GAAP.  Yet, Cherry Bekaert failed in its audits of MiMedx to appropriately test the Company's revenue recognition policies and procedures (including AvKARE) and associated internal controls.  Despite red flags of channel stuffing, including allegations set forth in whistleblower complaints, Cherry Bekaert continually blessed the Company's financial results, lending a false credibility to MiMedx management's rebuttal of these channel stuffing allegations.  Cherry Bekaert's disregard of its professional standards has now been exposed through over five years of restated financial results of MiMedx impacting at least eleven different financial accounts.

69.    PCAOB standards required Cherry Bekaert to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  AU §150.02.  Further, PCAOB standards required Cherry Bekaert to exercise "[d]ue professional care," which "requires the auditor to exercise professional skepticism" – "an attitude that includes a questioning mind and a critical assessment of audit evidence."  AU §§230.07, 316.13.  Importantly, in exercising professional

skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest. AU §230.09.

70.     Further, PCAOB standards specifically identify one area where the risk of material misstatement due to fraudulent financial reporting should be presumed by auditors, like Cherry Bekaert, for all audits. That area is revenue recognition. AS 12.68. As management is in a unique position to perpetrate fraud, PCAOB standards required Cherry Bekaert to expand the scope of its audit procedures to specifically address key fraud risks including revenue recognition. Cherry Bekaert either failed to identify the risk of improper revenue recognition or failed to perform required procedures to address the risk. Such procedures Cherry Bekaert should have considered relating to the risk of improper revenue recognition included:

- Performing substantive analytical procedures relating to revenue using disaggregated data, for example, comparing revenue reported by month and by product line or business segment during the current reporting period with comparable prior periods. Computer-assisted audit techniques may be useful in identifying unusual or unexpected revenue relationships or transactions.

- Confirming with customers certain relevant contract terms and the absence of side agreements, because the appropriate accounting often is influenced by such terms or agreements. For example, acceptance criteria, delivery and payment terms, the absence of future or continuing vendor obligations, the right to return the product, guaranteed resale amounts, and cancellation or refund provisions often are relevant in such circumstances.

- Inquiring of the entity's sales and marketing personnel or in-house legal counsel regarding sales or shipments near the end of the period and their knowledge of any unusual terms or conditions associated with these transactions.

- Being physically present at one or more locations at period end to observe goods being shipped or being readied for shipment (or returns awaiting processing) and performing other appropriate sales and inventory cutoff procedures.

- For those situations for which revenue transactions are electronically initiated, processed, and recorded, testing controls to determine whether they provide assurance that recorded revenue transactions occurred and are properly recorded.

AU §316.54 (footnote omitted).

71.    Cherry Bekaert could not have reasonably performed all these revenue recognition procedures or it would have uncovered the fraudulent revenue violations of the Company. A well-known fraud risk is that companies will engage in unusual transactions at quarter ends in order to achieve earnings targets. AU §316.85.A.2. Here, MiMedx manipulated end-of-quarter sales terms and inappropriately recognized revenue for over five years, while Cherry Bekaert continued to issue unqualified audit opinions on the Company's financial results. The egregious nature of these basic revenue recognition violations, over this length of time, makes it a virtual certainty that Cherry Bekaert could not have performed all of the above procedures or was complicit in the above practices of the Company. For example, due to a heightened risk of fraud, many of these auditing procedures are geared towards ensuring that sales

near the end of a reporting period (*i.e.*, sales cutoff procedures) are tested for appropriate revenue recognition, including the review for unusual terms or conditions that would prohibit recognizing the revenue.

72.    Similarly, Cherry Bekaert also was required under PCAOB standards to evaluate the business rationale for any significant unusual transactions. For example, when MiMedx was entering in to sales with distributors where the implicit arrangements modified the explicit terms of the contracts (*e.g.*, side agreements, consignment sales, additional performance obligations, rights of return, sales outside normal course of business), Cherry Bekaert was required to gain an understanding of the business rationale for such transactions and whether that rationale (or the lack thereof) suggests that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets. AU §316.66.

73.    Cherry Bekaert was also required to obtain more evidence to support its audit when the risk of material misstatement increased as it would have with MiMedx's growing revenues over the Class Period. For example, AS 15, *Audit Evidence*, states that the quantity of audit evidence needed is affected by the risk of material misstatement:

> Risk of material misstatement (in the audit of financial statements) or the risk associated with the control (in the audit of internal control over financial reporting). As the ***risk increases***, the amount of evidence that

- 40 -

the auditor should obtain *also increases*. For example, ordinarily *more evidence* is needed to respond to significant risks.

(Footnote omitted.)

74.     Further, as discussed above, PCAOB standards expressly note auditors should not be satisfied with less than persuasive evidence because of a belief that management is honest. Cherry Bekaert was required to obtain more persuasive evidence in areas of heightened risk.  AS 13.9.  Importantly, this meant Cherry Bekaert was precluded from using management representations as a substitute for the application of other audit procedures necessary to afford a reasonable basis for an opinion regarding MiMedx's financial statements and ICFR.  AU §333.02.  And if a management representation is contradicted by other audit evidence, the auditor should investigate the circumstance and consider the reliability of the representation made. AU §333.04.  In this regard, Cherry Bekaert was required to take in to account all relevant audit evidence, regardless of whether it appears to corroborate or to contradict the assertions in MiMedx's financial statements.  AS 14.03.

75.     As evidenced by the basic revenue recognition violations admitted to by MiMedx as part of the announced Restatement, Cherry Bekaert failed to obtain the appropriate evidential matter in support of its opinions, in part, due to at least the following audit failures:

- Failing to test appropriately MiMedx's revenue recognition policies and procedures and associated internal controls, which didn't even exist;

- Failing to modify and/or increase the nature, timing and extent of their testing to obtain reasonable assurance that MiMedx's financial statements were not materially misstated and prepared in accordance with GAAP; and

- Failing to apply the requisite professional skepticism and due professional care to management's representations regarding its revenue recognition policies with its distributors, including AvKARE.

76.    In addition, PCAOB standards require auditors to exercise heightened scrutiny when encountering and testing related party transactions. Clearly, sales made by MiMedx to certain distributors that were effectively under their control, such as AvKARE, CPM, and SLR, were susceptible to fraud and inappropriate manipulation. AU §§334.07, 334.09, *Related Parties* ("AU 334") states:

> The auditor should place emphasis on testing material transactions with parties he knows are related to the reporting entity . . . apply the procedures [the auditor] considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements.

77.    In June 2014, the PCAOB issued Auditing Standard No. 18 *Related Parties* ("AS 18") to replace AU 334 because the PCAOB's oversight activities at the time were indicating continuing weaknesses in auditors' scrutiny of related party transactions.[23] Like AU 334, AS 18 again warned auditors of the risks of related party

---

[23]    PCAOB Release No. 2014-002, at 2.

transactions, including that "such transactions potentially provide more of an opportunity for management to act in its own interests, rather than in the interests of the Company and its investors."[24] Further, AS 18 reiterated that "the objective of the auditor is to obtain sufficient appropriate audit evidence to determine whether related parties and relationships and transactions with related parties have been properly identified, accounted for, and disclosed in the financial statements." AS 18.2.

78. Despite these professional standards requiring Cherry Bekaert to place extra emphasis on material transactions with related parties, including whether such transactions have been properly accounted for, Cherry Bekaert still offered its approval for sales that violated basic revenue recognition principles.

79. Cherry Bekaert was required to also comply with AU §317, *Illegal Acts by Clients*, during the Class Period. In this regard, Cherry Bekaert was aware of two former employees, Kruchoski and Tornquist, filing a whistleblower complaint on December 15, 2016 alleging fraudulent revenue recognition practices through a channel stuffing scheme.[25] As a result, AU §317 required Cherry Bekaert to "obtain an understanding of the nature of the act, the circumstances in which it occurred, and sufficient other information to evaluate the effect on the financial statements." AU

---

[24] PCAOB Release No. 2014-002, at 4.

[25] *Kruchoski/Tornquist*, ECF No. 4.

§317.10. In addition, AU §317.11 identifies additional audit procedures that may be necessary to determine if a potential illegal act has occurred.

a. Examine supporting documents, such as invoices, canceled checks, and agreements and compare with accounting records.

b. Confirm significant information concerning the matter with the other party to the transaction or with intermediaries, such as banks or lawyers.

c. Determine whether the transaction has been properly authorized.

d. Consider whether other similar transactions or events may have occurred, and apply procedures to identify them.

80. Cherry Bekaert failed to comply with the auditing requirements of AU §317 by either failing to identify the whistleblower complaints as a potential illegal act that could materially impact MiMedx's financial reporting or failing to adequately perform the required auditing procedures for a potential illegal act to appropriately determine that MiMedx's financial statements were not materially misstated. Notably, MiMedx in less than two weeks-time, on December 27, 2016, announced preliminary investigation findings by the Company's Audit Committee. Unsurprisingly, the white-washed internal investigation found no credible evidence that MiMedx's prior financial reporting was incorrect in any respect. Correspondingly, Cherry Bekaert agreed with the Company's conclusions and ultimately issued a clean audit opinion on the Company's false financial statements included in its 2016 Form 10-K.

- 44 -

81.    Finally, Cherry Bekaert's failure to follow PCAOB standards is further

evidenced by the following admissions that have been made by MiMedx:

- MiMedx announced certain remedial measures due to the announced Restatement and material weaknesses in its ICFR. These remedial measures included the Company establishing an Ethics and Compliance Committee and newly established positions of Chief Accounting Officer and Internal Auditor.

- In an interim progress report submitted by MiMedx to the Nasdaq Hearings Panel on October 31, 2018, the Company indicated that it had determined for the Restatement period, it must conduct an assessment of revenue recognition *for all of the Company's sales*, which will prolong the amount of time it will take for the Company to prepare the restated financial statements.

- MiMedx's independent auditor, Ernst & Young resigned recently due in part to a "disagreement" with prior MiMedx senior management and "reportable events" as that term is defined in Item 304 (a)(1)(v) of Regulation S-K. These "reportable events" included:

    EY advised the Company that the internal controls necessary for the Company to develop reliable financial statements *do not exist*;

    EY advised the Company that EY is unable to rely on representations from the current Interim CEO and Interim CFO because, as of the date of the resignation, the current Interim CEO and Interim CFO, in turn, would have needed to rely on representations from certain legacy management personnel still in positions that could affect what is reflected in the Company's books and records;

    EY advised the Company of the need to significantly expand the scope of its audit, due to material allegations of inappropriate financial reporting, material allegations of noncompliance with laws and regulations, the findings to date from the independent investigation conducted by the Audit Committee into these allegations, and the lack of internal controls necessary for the Company to develop reliable financial statements; and

- 45 -

> EY advised the Company that information has come to EY's attention that EY has concluded materially impacts the reliability of previously issued financial statements, and the issues raised by this information have not been resolved to EY's satisfaction prior to its resignation.

82.     Cherry Bekaert failed to properly audit MiMedx's financial statements, including its revenue recognition and related internal controls. The fact MiMedx has admitted it had *no* internal controls to ensure accurate financial statements, that the Company's control environment was so problematic it resulted in a newly formed Ethics and Compliance Committee and that the Company must now go back to conduct an assessment of revenue recognition *for all of the Company's sales* as part of the announced Restatement clearly demonstrates that Cherry Bekaert turned a blind eye to MiMedx's accounting fraud. Their audit simply amounted to no audit at all and yet they continually issued clean audit opinions throughout the Class Period over the Company's materially misstated financial statements and ineffective ICFR.

83.     This is supported by the PCAOB, which identified deficiencies in Cherry Bekaert's audits of public registrants during the Class Period. For example, the PCAOB's "Report on 2015 Inspection of Cherry Bekaert LLP" issued on September 29, 2016 ("2015 PCAOB Report")[26] found audit deficiencies in Cherry Bekaert's audit procedures over "revenue recognition" and "revenue allowances." 2015 PCAOB

---

[26]   *Available at* https://pcaobus.org/Inspections/Reports/Documents/104-2016-183-Cherry-Bekaert.pdf.

Report at 5. Specifically, the PCAOB found that Cherry Bekaert failed "to perform sufficient procedures to identify and test the design and operating effectiveness of controls over revenue recognition" and failed "to perform sufficient procedures to test revenue allowances." *Id.* This warning from the PCAOB put Cherry Bekaert on notice for future audits, including any audits of MiMedx, that it needed to improve its audit procedures over revenue recognition and related sales allowances to ensure being in compliance with PCAOB standards.

84.    However, Cherry Bekaert did not heed to the PCAOB's warnings because similar audit deficiencies were found in the PCAOB's "Report on 2017 Inspection of Cherry Bekaert LLP," issued on July 26, 2018 ("2017 PCAOB Report").[27] The PCAOB found that Cherry Bekaert failed to perform sufficient audit procedures and thus failed to gain sufficient competent evidence to support its unqualified opinions. *See id.* at 4. Similar to some of the deficiencies found in the 2015 PCAOB Report, the audit failures included a failure to perform sufficient procedures over sales, sales-related estimates, accounts receivable and the evaluation of the severity of a control deficiency for a sales-related estimate, along with other items. *See id.* at 5.

---

[27]    *Available at* https://pcaobus.org/Inspections/Reports/Documents/104-2018-114-Cherry-Bekaert-LLP.pdf.

85.    As part of the 2017 inspection, the PCAOB reviewed the audits of five Cherry Bekaert clients and noted significant audit deficiencies with four of those five clients. 2017 PCAOB Report 3-6. Specifically, "Issuer B" identified in the 2017 PCAOB Report included the following audit deficiencies:

- "the failure, in an audit of ICFR, to perform sufficient procedures to test the design and operating effectiveness of controls over the occurrence, completeness, and valuation of sales and sales-related estimates (AS 2201.39, .42, .44, and .B9);

- the failure, in an audit of ICFR, to perform sufficient procedures to identify and test the design and operating effectiveness of controls over the existence and valuation of accounts receivable (AS 2201.39, .42, and .44);

- the failure, in an audit of ICFR, to perform sufficient procedures to evaluate the severity of a control deficiency related to a sales-related estimate (AS 2201.62-.63);

- the failure, in an audit of ICFR, to perform sufficient procedures to test the design and operating effectiveness of controls over the valuation of certain assets acquired and liabilities assumed, and controls over purchase consideration related to a business combination transaction (AS 2201.39, .42, and .44); and

- the failure to perform sufficient procedures to test the valuation of certain assets acquired and purchase consideration recorded related to a business combination transaction, including the failure to test the accuracy and completeness of issuer-provided data used by an issuer-engaged specialist (AS 1210.12; AS 2502.05, .26, and .28; AS 2810.03)."

2017 PCAOB Report at 5.

86.    These above deficiencies identified by the PCAOB on Issuer B support that Issuer B was Cherry Bekaert's audit of MiMedx.  For instance, MiMedx acquired Stability Biologics in January 2016 and MiMedx in its 2016 Form 10-K disclosed its use of a "third party specialist" to help with the "fair value" valuation of a $17.45 million earn out liability that was recorded as part of the acquisition.  *See* MiMedx 2016 Form 10-K at 60-63.  As noted above, the PCAOB found issue with Cherry Bekaert's audit of Issuer B in the areas of reviewing the work of a specialist and failing to perform sufficient procedures over the valuation of assets and liabilities in a business combination.  *See* 2017 PCAOB Report at 5, A-1 and A-8.

87.    In addition, as noted above, the PCAOB found issues with Cherry Bekaert's audit of Issuer B over sales, sales-related estimates and accounts receivable. In fact, the PCAOB noted that the deficiencies found in one of the five audits it examined was so significant that the issuer ***announced an intention to restate*** and ***report material weaknesses in ICFR***.  *See* 2017 PCAOB Report at 3 ("The inspection team identified matters that it considered to be deficiencies in the performance of the work it reviewed.  One of the deficiencies relates to auditing an aspect of an issuer's financial statements that the issuer announced an intention to restate and report a material weakness in ICFR after the primary inspection procedures were conducted from August 14, 2017 to August 17, 2017.").

- 49 -

88.     Moreover, the timing of the PCAOB's 2017 inspection of Cherry Bekaert, which started in August 2017 and concluded with a final report in July 2018, lines up with MiMedx's Restatement announcement made in June 2018. For example, the PCAOB started their inspection of Cherry Bekaert in August 2017, and then Cherry Bekaert received a draft report from the PCAOB in May 2018.[28]  2017 PCAOB Report at 13-14. Then, MiMedx announced an intention to restate and report material weaknesses in ICFR in June 2018 and a month later in July 2018 the PCAOB issued its final report on Cherry Bekaert. Notably, the Restatement announced by MiMedx in June 2018 was due primarily to improper revenue recognition, which lines up with the PCAOB's audit deficiencies found with Issuer B in the areas of sales, sales-related estimates and accounts receivable. Further, Cherry Bekaert only had 35 public clients at the time of PCAOB's inspection in August 2017 making it unlikely a large number of its clients publically announced the need to restate historical financial statements because of improper revenue recognition between August 2017 and July 2018.

---

[28]  The May 2018 draft report to Cherry Bekaert is non-public.

### 2.    Cherry Bekaert's Failure to Comply with PCAOB Standards over MiMedx's ICFR

89.    Cherry Bekaert also failed to adequately comply with PCAOB standards when auditing MiMedx's ICFR.   Despite Cherry Bekaert's Audit Report(s) assertion(s) that MiMedx's ICFR were effective, the truth was the Company had material weaknesses due to its false financial statements that were orchestrated by a complete absence of internal controls over the revenue recognition area and an ineffective control environment.   Cherry Bekaert was required to follow PCAOB Auditing Standard No. 5 ("AS 5"), when performing its audits on MiMedx's ICFR. Under AS 5, Cherry Bekaert was required to audit MiMedx's assessment of its internal controls and also independently reach its own conclusion about the effectiveness of MiMedx's internal controls.  AS 5.1 and 5.3.  AS 5 further describes specific procedures an auditor must perform over a company's control environment due to the control environment's significance in maintaining effective internal controls:[29]

---

[29]    A company's control environment is the "foundation for all other components of internal control, providing discipline and structure.  Control environment factors include the integrity, ethical values, and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors."  *See* Committee of Sponsoring Organizations Framework for Internal Controls Executive Summary at 4.

Because of its importance to effective internal control over financial reporting, the auditor must evaluate the control environment at the company.  As part of evaluating the control environment, the auditor should assess –

• Whether management's philosophy and operating style promote effective internal control over financial reporting;

• Whether sound integrity and ethical values, particularly of top management, are developed and understood; and

• Whether the Board or audit committee understands and exercises oversight responsibility over financial reporting and internal control.

AS 5.25.

90.    Under AS 5, "if one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective." AS 5.2. A material weakness is defined in AS 5 as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." AS 5.A7. Indicators of material weaknesses in its ICFR include the following:

• Identification of fraud, whether or not material, on the part of senior management;

• Restatement of previously issued financial statements to reflect the correction of a material misstatement;

• Identification by the auditor of a material misstatement of financial statements in the current period in circumstances that

> indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and

- Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.

AS 5.69.

91.     MiMedx's ICFR was ineffective because its control environment was virtually non-existent as the Company's leadership was solely focused on maximizing sales and not on ensuring compliance with GAAP. The Company's CEO, CFO, COO and Corporate Controller/Treasurer have all now been fired "for cause" for conduct detrimental to the Company.[30] Despite being MiMedx's auditor since 2008, Cherry Bekaert failed to identify that the Company's control environment was ineffective and allowed MiMedx to materially overstate financial results for over a five year period.

92.     The recent resignation of MiMedx's independent auditor EY on December 4, 2018 further demonstrates Cherry Bekaert's failure to follow PCAOB standards in conducting its audits over MiMedx's ICFR from fiscal year 2012 through fiscal year 2016. For example, while EY was engaged as MiMedx's auditor it advised the Company that the internal controls necessary for the Company to develop reliable

---

[30]   The September 20, 2018 Form 8-K at Exhibit 99.1 stated the MiMedx Board and Compensation Committee found that the four separated employees engaged in, among other things, "***conduct detrimental to the business or reputation of the Company.***"

financial statements *did not exist*. Further, MiMedx has now admitted it must go back and reassess the revenue recognition *for all of the Company's sales* as part of the announced Restatement. These shocking admissions by the Company go to the heart of Cherry Bekaert's audit opinions issued during the Class Period that MiMedx was maintaining effective internal controls as nothing short of a joke. It shows Cherry Bekaert's process amounted to no audit at all as they simply approved or recklessly disregarded the internal control failures and GAAP violations of a client that was too valuable to the members of the engagement team to lose. Consequently, Cherry Bekaert failed to conduct its audit in accordance with PCAOB standards.

### D.    Cherry Bekaert's False and Misleading Statements

93.    Cherry Bekaert's certifications and clean audit opinions caused MiMedx to issue materially false and misleading financial statements for fiscal years 2012-2016. As discussed above, MiMedx has admitted that all of these Cherry Bekaert-approved financial statements cannot be relied upon and must be restated.

94.    Moreover, the Audit Reports included in MiMedx's Form 10-Ks for fiscal years 2012-2016 contained the following materially false and misleading statements by Cherry Bekaert:

2012 Form 10-K issued on March 15, 2013

- In our opinion, the financial statements referred to above *present fairly, in all material respects, the consolidated financial position of MiMedx*

- 54 -

*Group, Inc. and subsidiaries as of December 31, 2012 and 2011, and the consolidated results of their operations and their cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America*.

- We also have audited, *in accordance with the standards of the Public Company Accounting Oversight Board* (United States of America), MiMedx Group, Inc.'s internal control over financial reporting as of December 31, 2012, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 15, 2013 *expressed an unqualified opinion*.

- In our opinion, MiMedx Group, Inc *maintained, in all material respects, effective internal control over financial reporting as of December 31, 2012*, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

- We have also audited, *in accordance with the standards of the Public Company Accounting Oversight Board* (United States of America), the consolidated balance sheets and the related consolidated statements of income, comprehensive income, stockholders' equity, and cash flows of MiMedx Group, Inc., and our report dated March 15, 2013 *expressed an unqualified opinion*.

- *We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).*

2013 Form 10-K issued on March 4, 2014

- In our opinion, the financial statements referred to above *present fairly, in all material respects, the consolidated financial position of MiMedx Group, Inc. and subsidiaries as of December 31, 2013 and 2012, and the consolidated results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2013 in conformity with accounting principles generally accepted in the United States of America*. Also in our opinion, the related consolidated financial

statement schedule for each of the three years in the period ended December 31, 2013, when considered in relation to the basic consolidated financial statements taken as a whole, *presents fairly, in all material respects*, the information set forth therein.

- We also have audited, *in accordance with the standards of the Public Company Accounting Oversight Board* (United States of America), MiMedx Group, Inc.'s internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 4, 2014 *expressed an unqualified opinion*.

- In our opinion, MiMedx Group, Inc *maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013*, based on criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

- We have also audited, *in accordance with the standards of the Public Company Accounting Oversight Board* (United States of America), the consolidated balance sheets of MiMedx Group, Inc. and subsidiaries as of December 31, 2013 and 2012, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years ended December 31, 2013, 2012 and 2011, and our report dated March 4, 2014 *expressed an unqualified opinion*.

- *We hereby consent* to the incorporation by reference in the Registration Statements (Form S-8 Nos. 333-153255, 333-183991, and 333-189784, and Form S-3 No. 333-189785) of our reports dated March 4, 2014, included in this Annual Report on Form 10-K of MiMedx Group, Inc. and Subsidiaries (the Company) relating to the consolidated balance sheets of the Company as of December 31, 2013 and 2012, and the related consolidated statements of operations, stockholders' equity, and cash flows and the related consolidated financial statement schedule for each of the three years in the period ended December 31, 2013, and the effectiveness of internal control over financial reporting for the Company as of December 31, 2013.

- ***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).***

2014 Form 10-K issued on March 13, 2015

- In our opinion, the financial statements referred to above ***present fairly, in all material respects, the consolidated financial position of MiMedx Group, Inc. and subsidiaries as of December 31, 2014 and 2013, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2014 in conformity with accounting principles generally accepted in the United States of America***. Also in our opinion, the related consolidated financial statement schedule for each of the three years in the period ended December 31, 2014, when considered in relation to the basic consolidated financial statements taken as a whole, ***presents fairly, in all material respects***, the information set forth therein.

- We also have audited, ***in accordance with the standards of the Public Company Accounting Oversight Board*** (United States), MiMedx Group, Inc.'s internal control over financial reporting as of December 31, 2014, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 13, 2015 ***expressed an unqualified opinion***.

- In our opinion, MiMedx Group, Inc ***maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014***, based on criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

- We have also audited, ***in accordance with the standards of the Public Company Accounting Oversight Board*** (United States), the consolidated balance sheets of MiMedx Group, Inc. and subsidiaries as of December 31, 2014 and 2013, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2014 and the related consolidated financial

statement schedules as of December 31, 2014, 2013 and 2012, and our report dated March 13, 2015 *expressed an unqualified opinion*.

- **We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).**

2015 Form 10-K issued on February 29, 2016

- In our opinion, the financial statements referred to above ***present fairly, in all material respects, the consolidated financial position of MiMedx Group, Inc. and subsidiaries as of December 31, 2015 and 2014, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2015 in conformity with accounting principles generally accepted in the United States of America***. Also in our opinion, the related consolidated financial statement schedule for each of the three years in the period ended December 31, 2015, when considered in relation to the basic consolidated financial statements taken as a whole, ***presents fairly, in all material respects***, the information set forth therein.

- We also have audited, ***in accordance with the standards of the Public Company Accounting Oversight Board*** (United States), MiMedx Group, Inc.'s internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 29, 2016 ***expressed an unqualified opinion***.

- In our opinion, MiMedx Group, Inc ***maintained, in all material respects, effective internal control over financial reporting as of December 31, 2014***[31], based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

---

[31] After a series of SEC comment letters were exchanged between the Company and the SEC, MiMedx ended up filing a 2015 Form 10-K/A on February 22, 2017 to correct this typographical error in Cherry Bekaert's audit opinion which should have been December 31, 2015.

- We have also audited, *in accordance with the standards of the Public Company Accounting Oversight Board* (United States), the consolidated balance sheets of MiMedx Group, Inc. and subsidiaries as of December 31, 2015 and 2014, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2015 and the related consolidated financial statement schedules as of December 31, 2015, 2014 and 2013, and our report dated February 29, 2016 *expressed an unqualified opinion*.

- *We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States of America).*

2016 Form 10-K issued on March 1, 2017

- In our opinion, the consolidated financial statements referred to above *present fairly, in all material respects, the consolidated financial position of MiMedx Group, Inc. and subsidiaries as of December 31, 2016 and 2015, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2016, in conformity with accounting principles generally accepted in the United States of America*. Also, in our opinion, the related consolidated financial statement schedule for each of the three years in the period ended December 31, 2016, when considered in relation to the basic consolidated financial statements taken as a whole, *presents fairly, in all material respects,* the information set forth therein.

- We also have audited, *in accordance with the standards of the Public Company Accounting Oversight Board* (United States), MiMedx Group, Inc.'s internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 1, 2017 expressed an adverse opinion.

- A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's

annual or interim financial statements will not be prevented or detected on a timely basis. ***The following material weakness has been identified and included in management's assessment.*** Management has identified a material weakness in the design of the Company's controls over the tax accounting related to an overstatement of an excess tax benefit which if undetected would have resulted in an understatement of income taxes payable. Specifically, management did not have adequate supervision and review of certain technical tax accounting performed by a third party tax specialist in 2016. This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2016 financial statements, and this report does not affect our report dated March 1, 2017, on those financial statements.  In our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, MiMedx Group, Inc. has not maintained effective internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

- We have also audited, ***in accordance with the standards of the Public Company Accounting Oversight Board*** (United States), the consolidated balance sheets and the related consolidated statements of operations, stockholders' equity, and cash flows of MiMedx Group, Inc., and our report dated March 1, 2017, ***expressed an unqualified opinion.***

- ***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States of America).***

95.    These statements were materially false and misleading and omitted material facts for the reasons discussed above, including:

(a)    MiMedx's financial statements did not "present fairly, in all material respects, the consolidated financial position of MiMedx . . . and the consolidated results of their operations and their cash flows" and were not prepared in

conformity with GAAP due to material misstatements of at least the following financial accounts: gross margin, operating income, income before taxes, income taxes, net income, EPS, accounts receivable and related reserves, returns allowances, inventories, and other financial items in particular periods;

(b)    MiMedx did not maintain effective ICFR in all material respects for fiscal years 2012-2015, and MiMedx's material weaknesses in ICFR for fiscal year 2016 were not limited to the design of the Company's controls over the tax accounting related to an overstatement of an excess tax benefit; and

(c)    Cherry Bekaert did not conduct its 2012, 2013, 2014, 2015, and 2016 audits of MiMedx's financial statements and ICFR in accordance with the standards of the PCAOB and falsely expressed unqualified audit opinions.

## VI.    THE TRUTH BEGINS TO EMERGE

96.    During the Class Period, MiMedx's fraudulent scheme grew so large that it could no longer be kept a secret. News of the fraud began to slowly leak out publicly, through various sources including whistleblower complaints. As a result, the Company began to attract scrutiny from various governmental agencies, including the DOJ, SEC, VA, and HHS. This created a snowball effect that gradually led to the Company's downfall and eviscerated the Company's stock price, which had been buoyed throughout the Class Period by the fraud.

97.    On August 10, 2017, the Company revealed that it had "effectively dismissed" Cherry Bekaert, effective August 4, 2017, replacing it with EY as the new independent registered public accounting firm for fiscal year 2017. The Company gave no reason for this sudden change, but claimed that there "were no disagreements with Cherry Bekaert on any matters of accounting principles or practices, financial statement disclosure or auditing scope and procedures which, if not resolved to the satisfaction of Cherry Bekaert, would have caused Cherry Bekaert to make reference to the matter in their report."

98.    Also, on September 20, 2017, two research groups – Aurelius Value and Viceroy Research Group – published separate reports targeted at MiMedx detailing a number of red flags indicating potential fraudulent activity. For instance, the Aurelius Value report entitled, "MiMedx: Flying Too Close To The Sun" summarized its findings as follows:

> We see large undiscounted channel stuffing and kickback risks lurking beneath the surface at MiMedx (NASDAQ: MDXG). This report specifically exposes:
>
> Undisclosed related party transactions and entanglements with distributors, including a key MiMedx distributor that has been controlled by an insider. These relationships are especially problematic because secret ties to distributors have featured prominently in historical channel stuffing schemes.
>
> Detailed allegations that MiMedx's channel stuffing scheme relies on at least three more distributors who have undisclosed special

agreements involving millions in discounted product and favorable financing terms as "house accounts". Not only does the alleged scheme now extend significantly beyond the VA, but MiMedx has allegedly manipulated its financials through multiple avenues to hit sales targets.

Documents showing that over 40 podiatrists across the country, including the current President of the American Podiatric Medical Association, received undisclosed membership interests in a MiMedx reseller linked to MiMedx affiliates. The HHS Office of Inspector General has declared physician owned distributors as "inherently suspect" in a special fraud alert.

99.    On February 15, 2018, short seller Aurelius Value published an article entitled "An Open Letter to the MiMedx Auditors" ("Aurelius article"). The article, addressed to EY, MiMedx's outside auditors at that time, and included allegations that there was a "serious and pervasive fraud" within the Company.

100.    The Aurelius article also alleges that MiMedx, through its primary Veterans Affairs distributor, AvKARE, has been "abus[ing its] accounting policy" of recognizing revenue when it is distributed as opposed to when it is actually utilized by "hit[ting] sales targets by filling shelves before the end of quarters with excess product that neither AvKARE nor the VA had requested."

101.    On February 20, 2018, MiMedx issued a press release announcing that it was postponing the release of its fourth quarter 2017 ("4Q17") and fiscal year 2017 financial results due an Audit Committee investigation into the sales and distribution practices of the Company. The Company stated that the investigation was being

conducted by "independent legal and accounting advisors" engaged by the Audit Committee of the MiMedx Board.

102.   On this news, the NASDAQ temporarily suspended all trading of MiMedx and the price of MiMedx stock plummeted more than 39% on February 20, 2018, falling from $14.47 per share on February 16, 2018 to close at $8.75 per share on February 20, 2018 on unusually high trading volume.

103.   In the SEC Form 8-K filed on March 15, 2018, the Company further revealed that it was delaying the filing of its SEC Form 10-K for fiscal year 2017 in connection with its internal investigation into sales and distribution practices:

> As previously announced, the Audit Committee of the Company's Board of Directors is conducting an independent investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices, including allegations made by certain former employees and short sellers. As a result, the Company has delayed the filing of its Form 10-K for the year ended December 31, 2017. The Company looks forward to the completion of the Audit Committee's investigation.

104.   On February 26, 2018, *Bloomberg* released an article, "U.S. Probes MiMedx's Federal Contracts, Accounting," stating that, according to multiple sources, the DOJ was investigating whether the Company "overcharged the government for its tissue-repair products" and looking into the Company's "distribution practices – including whether it inappropriately booked sales of products that hadn't been ordered, a practice known as channel stuffing." The article further reported that the

SEC enforcement division's "Denver office has been working with federal prosecutors in Manhattan" regarding the Company's distribution practices.

105.   The Company finally began to admit its fraud before the market opened on June 7, 2018, when MiMedx confirmed that nearly six years of financial statements were materially incorrect.  The Company issued a press release stating that an internal investigation had shown that its reported financial results for fiscal years 2012-2016 and the first three quarters of 2017 were no longer reliable and would have to be restated.  The Company also said that all communications and financial information with respect to 4Q17 and the first quarter of 2018 were no longer reliable and withdrew its guidance for 2018, after misleadingly reaffirming it earlier in the year.

106.   The Company tied the problems specifically to revenue recognition issues, which it claimed were discovered during the Company's ongoing Audit Committee investigation.  Specifically, the press release stated that the investigation had "primarily been focused on the accounting treatment afforded to [certain] sales and distribution practices" and found that "certain implicit arrangements" between the Company and two unnamed distributors had "modified the explicit terms of the contracts [with MiMedx], impacting revenue recognition during specified periods." The press release provided no other details on the matter, but added that "the Audit Committee investigation is ongoing, continues to evaluate sales and distribution

practices at other distributors and customers, and may ultimately result in the identification of additional issues, broaden the scope of financial items or periods required to be restated, may result in additional actions taken by the Company, and may affect the preliminary conclusions expressed [in the June 7 press release]." The Company was unable to estimate when it would file the restated financial statements or a Form 10-K for fiscal year 2017 and subsequent interim periods.

107.    In the same June 7, 2018 press release, the Company announced an extensive change of executive leadership. Senken and the Company's Controller and Treasurer, Cranston, left the Company, effective June 6, 2018. Edward J. Borowski, an Executive Vice President of the Company, was named interim CFO in place of Senken.

108.    In response to this news, the Company's stock price dropped 23.39%, falling from $8.21 per share at the close of trading on June 6, 2018 to $6.29 per share at the close of trading on June 7, 2018 on well-above average trading volume of approximately 16 million shares.

109.    On July 2, 2018, before the market opened, the Company issued a press release announcing that Petit and Taylor resigned from their executive positions effective June 30, 2018. Taylor also resigned as a Director of the Company, while Petit resigned as Chairman of the Board but remained a Director. The Company

specifically linked these resignations to the Company's internal investigation findings, stating:

> These resignations . . . are based on the Board of Directors' business judgment regarding the Company's leadership and direction, and arise, in part, from information the Audit Committee has identified through its previously announced independent investigation. This investigation is ongoing and there may be other actions taken based, at least in part, on information from the investigation.

110.  In response to this news, the Company's stock price plummeted 38.50% from a close of $6.39 per share on Friday, June 29, 2018, to a close of $3.93 per share on Monday, July 2, 2018, on well-above average trading volume of 14.5 million shares.

## VII.  POST-CLASS PERIOD EVENTS

111.  On August 31, 2018, MiMedx filed a Form 8-K disclosing the termination of its credit facility with Bank of America, N.A. dated as of October 12, 2015, eliminating a critical source of financing for the Company.  In the filing, the Company explained that the Credit Agreement with Bank of America, N.A. required the Company to file certain periodic reports with the SEC.  But this was no longer possible because, "[a]s previously disclosed, the Company's Audit Committee is conducting an independent internal investigation into current and prior-period matters concerning sales and distribution practices and other matters. . . . The Company . . . cannot file any restatements of its previously filed financial statements and related

reports with the [SEC] until the Audit Committee's investigation is completed and audited financial statements have been prepared."

112. On September 20, 2018, MiMedx issued a press release blaming Petit, Senken, Taylor, and Cranston for misconduct uncovered by the Audit Committee's internal investigation. The Company announced that Petit had resigned from the MiMedx Board of Directors effective immediately. Moreover, the Company stated that Petit's resignation – and the prior resignations of Senken, Taylor, and Cranston – would be treated as terminations "for cause" based on information identified in the Audit Committee's ongoing independent investigation. The Company further announced that, because Petit, Senken, Taylor, and Cranston "engaged in, among other things, conduct detrimental to the business or reputation of the company," the Company was forfeiting all of their outstanding equity and incentive awards and clawing back certain compensation. The Company characterized these actions as "necessary steps to prepare MiMedx for its next chapter and a stronger future," and stated that the Audit Committee's investigation was still ongoing and "there may be other actions taken based, as least in part, on information from the investigation."

113. On November 7, 2018, MiMedx announced that it had received a delisting notification from the NASDAQ "as a result of the interim progress report submitted by the Company on October 31, 2018." The progress report disclosed to

the NASDAQ further information on the extreme magnitude of the Company's revenue recognition problems, which the Company now admitted would require a review of "*all* of the Company's sales" dating back to 2012. Specifically, the Company explained that:

> the Company indicated that it has now determined that, for the restatement period [2012-2017], *it must conduct an assessment of revenue recognition for all of the Company's sales*, which will prolong the amount of time it will take for the Company to prepare the restated financial statements. As a result, [the Company] no longer believes that it is likely that it will be able to regain compliance with SEC reporting obligations and NASDAQ listing rules by February 25, 2019.

The Company added that "[i]n its report, the Company also indicated that the fact-finding stage of the Audit Committee's investigation is substantially complete with respect to most areas, but some work remains on certain potential issues."

114. Separately, the Company announced on the same day, November 7, 2018, that the Board had approved a "poison pill" because the Company was "particularly vulnerable to a creeping acquisition of actual or *de facto* control through open market accumulation or other tactics" given "the Company's current market capitalization, the delisting of the Common Stock from Nasdaq and the anticipated substantial and volatile trading activity following Nasdaq's suspension of trading in the Common Stock." Through the poison pill (*i.e.*, "shareholder rights" plan), the Company would issue new preferred stock to existing shareholders giving them rights

- 69 -

to acquire MiMedx shares at a 50% discount.  The rights would become exercisable if a person or investor group acquired 10% or more of MiMedx's shares without approval of the Company Board.

115.   In response to this news, the Company's share price was eviscerated, plummeting *41%* from a close of $6.22 per share on November 6, 2018, to a close of $3.66 per share on November 7, 2018, on extremely high trading volume of approximately 28 million shares.  The stock price continued to fall an additional 19% the following day, closing at $2.95 per share on November 8, 2017, on trading volume of over 39 million shares.

116.   Then on December 5, 2018, MiMedx released a slew of bad news detailing additional fallout from the unraveling of the Company's fraud.  First, the Company announced that Cashman, a key figure in the fraud, "will be departing the organization," as part of what the Company termed a "broad-based organizational realignment program" that would also eliminate Cashman's position as Chief Commercialization Officer.

117.   MiMedx separately issued a press release that provided details on its "[o]rganizational [r]ealignment [p]rogram" intended to "simplify and streamline our organizational structure, and reduce costs in order to improve profitability and liquidity."  As part of the realignment, the Company announced that it would be firing

- 70 -

nearly a quarter (24%) of its total workforce – about half of which would be salesforce personnel – among other cost-cutting measures. The Company explained that the dramatic organizational realignment was driven by, among other things, changes to business practices exposed by the Audit Committee's investigation. These changes had reduced the Company's sales and revenue that were previously manipulated and inflated by the fraudulent practices detailed herein, in turn hurting profitability and liquidity.

118.    Finally, on December 5, 2018, MiMedx announced that its outside auditor, EY, had informed the Company's Audit Committee on December 4, 2018, that it had "resigned from the engagement to audit the Company's financial statements for the years ended December 31, 2017 and 2018, effective immediately." EY had served as auditor for less than a year-and-a-half, after replacing Cherry Bekaert, which suspiciously departed in August 2017, as details of the Company's fraudulent accounting became public.

119.    In response to this wave of bad news, MiMedx's stock price collapsed, falling *59%* from a close of $2.95 per share on December 4, 2018, to a close of $1.20 per share on the next trading day, December 6, 2018 (after reaching an all-time low of $0.95 mid-day), on unusually heavy trading volume of over 29 million shares.

120.    In a Form 8-K filed on December 7, 2018, MiMedx further disclosed that, during the time of EY's engagement as independent auditor, EY had advised MiMedx, in relevant part, that:

- "the internal controls necessary for the Company to develop reliable financial statements do not exist";

- "Although EY could accept representations from the current Interim CEO and Interim CFO based on their knowledge, EY advised the Company that EY is unable to rely on representations from them because, as of the date of the resignation, the current Interim CEO and Interim CFO, in turn, would have needed to rely on representations from certain legacy management personnel still in positions that could affect what is reflected in the Company's books and records. At the time of EY's resignation, the Audit Committee's independent investigation was still ongoing";

- "the Company . . . need[ed] to significantly expand the scope of its audit, due to material allegations of inappropriate financial reporting, material allegations of noncompliance with laws and regulations, the findings to date from the independent investigation conducted by the Audit Committee into these allegations, and the lack of internal controls necessary for the Company to develop reliable financial statements"; and

- "information has come to EY's attention that EY has concluded materially impacts the reliability of previously issued financial statements, and the issues raised by this information have not been resolved to EY's satisfaction prior to its resignation."

## VIII.  CLASS ACTION ALLEGATIONS

121.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired MiMedx securities from March 4, 2014 through June

29, 2018, inclusive ("Class"). Excluded from the Class are Defendant, directors and officers of the Company, as well as their families and affiliates.

122.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MiMedx securities were actively traded on the NASDAQ stock exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. As of October 13, 2017, there were 111,034,873 shares of MiMedx common stock outstanding. Record owners and other members of the Class may be identified from records maintained by MiMedx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

123.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether Defendant violated the Exchange Act;

(b)    whether and to what extent MiMedx's financial statements during the Class Period failed to comply with GAAP;

(c)    whether Defendant knew or recklessly disregarded that their statements were false and misleading;

(d)    whether Cherry Bekaert's audits of MiMedx's financial statements during the Class Period were conducted in accordance with PCAOB standards;

(e)    whether Cherry Bekaert abandoned its duty of independence as MiMedx's auditor;

(f)    whether the price of the Company's stock was artificially inflated; and

(g)    the extent of damage sustained by Class members and the appropriate measure of damages.

124.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendant's wrongful conduct alleged herein.

125.   Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

126.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    LOSS CAUSATION

127.    During the Class Period, as detailed herein, Defendant engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MiMedx stock and operated as a fraud or deceit on Class Period purchasers of MiMedx stock by failing to disclose and misrepresenting the adverse facts detailed herein.    When Defendant's prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market through a partial disclosure, the price of MiMedx stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of MiMedx stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about MiMedx was revealed through the several disclosures specified herein, which removed the artificial inflation from the price of MiMedx common stock.

128.    By failing to disclose to investors the adverse facts detailed herein, Defendant presented a misleading picture of MiMedx's business and prospects. Defendant's false and misleading statements had the intended effect and caused MiMedx stock to trade at artificially inflated levels throughout the Class Period.

129. As a direct result of the disclosures identified herein, the price of MiMedx stock fell precipitously. This removed the artificial inflation from the price of MiMedx stock, causing real economic loss to investors who had purchased MiMedx stock at artificially inflated prices during the Class Period.

130. The price declines were a direct result of the nature and extent of Defendant's fraud being revealed to investors and the market through several partial disclosures. The timing and magnitude of the price declines in MiMedx stock negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendant's fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendant's fraudulent scheme to artificially inflate the price of MiMedx stock and the subsequent significant decline in the value of MiMedx stock when Defendant's prior misrepresentations and other fraudulent conduct were revealed.

## X.    FRAUD ON THE MARKET

131. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

(a)    Defendant made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's common stock traded in efficient markets;

(d)     The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased the Company's common stock between the time Defendant misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

132.    At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendant.

## XI.    NO SAFE HARBOR

133.    The statutory safe harbor provided for forward-looking statements under certain conditions do not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as forward-looking statements when made.

134.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder

135.    Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

136.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(b).  Cherry Bekaert alone, and acting in concert with others, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about MiMedx which resulted in misstatements and omissions of material facts in the Company's financial reporting.  Cherry Bekaert employed devices, schemes, and artifices to defraud while in possession of material, adverse

non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about the Company not misleading.

137.   Cherry Bekaert knew, or was reckless in not knowing, that MiMedx's reported annual financial results for fiscal years 2012-2016, which were disseminated to the investing public, were materially overstated and were not presented in accordance with GAAP; and that the audits were not performed in accordance with PCAOB standards, therefore, each of Cherry Bekaert's unqualified audit reports were materially false and misleading.

138.   Cherry Bekaert knew, or should have known, that MiMedx's financial statements for the relevant period were materially false and misleading. As described above, Cherry Bekaert failed to perform audits and reviews in accordance with accepted auditing principles and procedures.

139.   As a result of Cherry Bekaert's clean audit opinions of MiMedx's misstated financial reports and Cherry Bekaert's own false and misleading statements and omissions in its unqualified audit reports, the market price of the Company's securities were artificially inflated throughout the Class Period.

140.   All annual filings by MiMedx with the SEC (on which the public relies) for fiscal years 2012-2106 were based on revenue recognition issues discovered during MiMedx internal audit investigation focused on the accounting treatment of certain sales and distribution practices.

141.   Cherry Bekaert, MiMedx's outside independent auditor throughout the Class Period, failed to detect these discrepancies and irregularities, or take reasonable actions to correct them.

142.   Had Cherry Bekaert not violated principles and standards of the PCAOB, it would have detected the material weakness in MiMedx's ICFR and the fraudulent revenue recognition and material misstatements in MiMedx's financial statements for fiscal years 2012-2016.

143.   Instead, Cherry Bekaert acted with knowledge or reckless disregard as to (a) the false and misleading nature of the certifications it provided, (b) the false and misleading nature of MiMedx's financial statements and ineffective internal controls, (c) its failure to conduct proper audit tests and examinations of the books, records and financial statements of MiMedx, and (d) the false representations that the financial statements had been properly audited in accordance with PCAOB standards.

144.   In violation of PCAOB standards, Cherry Bekaert failed to expand the scope of its audits notwithstanding its knowledge or reckless ignorance of

innumerable red flags that should have put it on notice of the revenue recognition practices and misstatements by MiMedx. Cherry Bekaert had "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AU110.02. If there is a material misstatement, whether by fraud or mistake, the auditors' procedures need to be designed and performed to detect it. Further, the auditor is required to view the audit evidence with professional skepticism.

145. Cherry Bekaert's conduct represents an extreme departure from the professional standards that should have been applied. Had Cherry Bekaert exercised due professional care and professional skepticism, it would have determined that MiMedx's internal controls over revenue recognition were non-existent, its accounting treatment of certain sales and distribution practices was improper and that the Company's books and records were consistently falsified to conceal the Company's true financial condition.

146. Cherry Bekaert knew that its reports would be relied upon by present and potential investors in MiMedx securities.

147. Plaintiff and other members of the Class were ignorant of the fact that the market price of MiMedx's securities was artificially inflated during the Class Period.

As a result, Plaintiff and other members of the Class acquired the Company's securities during the Class Period at artificially high prices and were damaged thereby.

148. By virtue of the foregoing, Cherry Bekaert violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

149. For the reasons set forth herein, Cherry Bekaert is liable in whole or in part for the damages suffered by Plaintiff and Class members.

**COUNT II**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5(a) and (c) Promulgated Thereunder**

150. Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

151. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiff need not allege in this Count nor prove in this case that Cherry Bekaert made any misrepresentations or omissions of material fact for which it may also be liable under Rule 10b-5(b) and/or any other provisions of law.

152. During the Class Period, Cherry Bekaert pursued an unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate the market price of MiMedx common

stock; and (iii) cause Plaintiff to purchase the Company's securities at artificially inflated prices.

153.   In furtherance of this unlawful course of conduct, Cherry Bekaert employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of MiMedx securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

154.   Cherry Bekaert's fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included: (i) failing to test appropriately MiMedx's revenue recognition policies and procedures and associated internal controls, which didn't even exist; (ii) failing to modify and/or increase the nature, timing and extent of their testing to obtain reasonable assurance that MiMedx's financial statements were not materially misstated and prepared in accordance with GAAP; and (iii) failing to apply the requisite professional skepticism and due professional care to management's representations regarding its revenue recognition policies with its distributors, including AvKARE.

155.   During the Class Period, Plaintiff and the Class were unaware of Cherry Bekaert's conduct. Had Plaintiff and the Class known of the unlawful scheme and

unlawful course of conduct, they would not have purchased MiMedx securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

156.    As a direct and proximate result of Cherry Bekaert's conduct, as described herein, Plaintiff and the Class suffered damages in connection with their purchases of MiMedx securities during the Class Period.

157.    By reason of the foregoing, Cherry Bekaert violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and is liable to Plaintiff and the Class for damages suffered in connection with their purchases of MiMedx securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as Class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against Defendant, for all damages sustained as a result of Defendant's

wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C.    Awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.    Awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

DATED:  March 4, 2019                    ROBBINS GELLER RUDMAN
                                         & DOWD LLP

                                         _____
                                         JOHN C. HERMAN
                                            (Georgia Bar No. 348370)
                                         PETER M. JONES
                                            (Georgia Bar No. 402620)
                                         CARLTON R. JONES
                                            (Georgia Bar No. 940540)
                                         Monarch Tower, Suite 1650
                                         3424 Peachtree Road, N.E.
                                         Atlanta, GA  30326
                                         Telephone:  404/504-6500
                                         404/504-6501 (fax)
                                         jherman@rgrdlaw.com
                                         pjones@rgrdlaw.com
                                         cjones@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
ARTHUR C. LEAHY
HILLARY B. STAKEM
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
artl@rgrdlaw.com
hstakem@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com

*Lead Counsel for Plaintiff*

CAVANAGH & O'HARA
JOHN T. LONG
2319 West Jefferson Street
Springfield, IL  62702
Telephone:  217/544-1771
217/544-9894 (fax)

*Additional Counsel for Plaintiff*